UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JULIA MACY CANNON,

Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

Defendant.

Case No.: 3:17-cv-02141-AJB-PCL

**REPORT AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE RE:**

**PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
DEFENDANT'S CROSS MOTION FOR
SUMMARY JUDGMENT**

## I. INTRODUCTION

Before the Court now is Plaintiff JULIA MACY CANNON ("Plaintiff"), seeking judicial review of a decision by the Social Security Administration regarding Plaintiff's application for supplemental security income benefits ("SSI") pursuant to 42 U.S.C. section 405(g). (Doc. 1.) Plaintiff has filed for summary judgment; and defendant NANCY A. BERRYHILL ("Commissioner" or "Defendant") has filed a cross-motion for summary judgment. (Docs. 18, 20.)

The Honorable Anthony J. Battaglia has referred the matter to the undersigned Judge for Report and Recommendation pursuant to 28 U.S.C. section 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). Having carefully considered the motions, pleadings, and administrative record lodged in this case, the Court recommends Commissioner's motion

1

for summary judgment be **GRANTED** and Plaintiff's motion for summary judgment be **DENIED**.

## II. FACTUAL BACKGROUND

On June 11, 2013, Plaintiff applied for SSI. (Administrative Record (AR) at 143.) At that time, Plaintiff was 42 years old. (*Id.*) In this application, Plaintiff claims she is qualified to receive SSI because she suffers from the following conditions which render her disabled: fibromyalgia, lupus, hypothyroidism, anxiety/panic attacks, back pain spasms, migraine headaches, high blood pressure, insomnia, tremors, memory problems, irritable bowel syndrome, knee problems, fainting and falling, weakness, extreme fatigue with an inability to stay awake, heavy menstrual cycles, and severe depression. (*Id.*) Plaintiff states these various conditions caused Plaintiff to be unable to work on July 28, 2009. (*Id.*)

Plaintiff recalled her medical issues beginning when she was a child. (AR at 63.) Specifically, Plaintiff testified she would become severely sunburned after only a short time outdoors. (*Id.*) Since her childhood, Plaintiff has continued to struggle with medical issues, but none severe enough to disrupt her life until July 2009. In fact, in letters to the Administrative Law Judge (ALJ) from friends of Plaintiff's family, Plaintiff was noted to be an avid soccer player and dancer as a child. Plaintiff was married, but currently is separated from her husband.[1] At some point thereafter, Plaintiff moved into her parents' home, where she resides currently.[2]

Prior to 2009, Plaintiff had worked as a dance teacher and choreographer at a studio owned by her mother and aunt. Plaintiff began this work in 1992 and continued steadily until July 1, 2009. (*Id.* at 152.) In this position, Plaintiff coordinated and

---

[1] Plaintiff reported to a treating physician in 2015 that she "has been troubled by her husband's sudden departure several years ago." (AR at 637.) Plaintiff at that point had not had any contact with him, and was worried about infidelity. (*Id.*)

[2] It is noted that around October 24, 2013, Plaintiff had been evicted from where she had been currently living. (AR at 493.) There is no indication whether this was the event prompting Plaintiff to move in with her parents, or whether this occurred after Plaintiff was already residing with her parents.

choreographed dance routines, as well as the costumes for those routines. (*Id.* at 55.) Plaintiff considered the job to be very physical. (*Id.*) However, in 2009, Plaintiff was in too much pain to continue this very physical work at the dance studio, and ended up closing the studio's doors. Since then, Plaintiff has spent the majority of her time in bed due to pain. (AR at 59.) Plaintiff equated the pain to feeling "like I've got[ten] hit by a mac truck." (*Id.* at 60.) Plaintiff's average day consists of staying indoors, in Plaintiff's bed, and watching movies. (*Id.* at 57.) At the hearing before the ALJ on July 25, 2017, Plaintiff presented in a wheelchair due to the pain. (*Id.* at 58.) Plaintiff testified the wheelchair had provided relief while Plaintiff was still working at the dance studio, and continued to provide relief through the time of the hearing. (*Id.*)

In the course of discovering, diagnosing, and treating her medical conditions, Plaintiff has seen a number of medical professionals. There are six medical professionals whose records were lodged with the Court. Additionally, Plaintiff was examined by medical professionals contracted by the government for purposes of reviewing and determining Plaintiff's SSI application. These records are summarized as follows:

a. Scripps (Dr. Nevins and Dr. Cortes)

Plaintiff began seeing Dr. Melinda Nevins at Scripps 20 years ago, and Dr. Nevins remains her primary care physician today. From the beginning of Plaintiff and Dr. Nevins' doctor-patient relationship, Plaintiff has complained of chronic unrelenting pain, fatigue, inability to concentrate, tremors, anxiety, and inability to perform the tasks of daily living. There is no indication as to when each complaint actually arose, but the records are clear that at some point throughout the relationship, Plaintiff raised each complaint with Dr. Nevins. During their 20 year relationship, Plaintiff has seen Dr. Nevins every three to four months, on average. The provided records indicate Dr. Nevins prescribed Plaintiff multiple medications to alleviate the symptoms of Plaintiff's hypothyroidism, chronic pain syndrome and fibromyalgia, and anxiety. (*See*, *e.g.*, AR at 455.) While Dr. Nevins is Plaintiff's primary care physician, Plaintiff has also seen other physicians at Scripps.

In 2012, Plaintiff's medical records from Dr. Nevins and Dr. A. Cortes indicate Plaintiff began struggling with the management of her medications, especially in taking the correct dosage.[3] On October 10, 2012, Plaintiff presented with self-diagnosed shingles on her torso, which Plaintiff claimed were painful and itched. (*Id.* at 465.) Dr. Cortes noted during this consultation that Plaintiff had been told repeatedly to not deviate from her prescribed usage of medications. Presumably, Plaintiff had been taking more than the prescribed amount. On October 25, 2012, Plaintiff again presented with the same symptoms, which the medical assistant described as "*'shingles'*" and noted there were red bumps on Plaintiff's thighs. (*Id.* at 464.) Dr. Nevins prescribed medications to alleviate these symptoms and refilled Plaintiff's other prescriptions at this time.

On November 9, 2012, Dr. Cortes attended Plaintiff and noted Plaintiff was taking Xanax, Percocet, and Soma in "unusually high doses despite being warned." (*Id.* at 463.) Based on Plaintiff's disregard of the warnings to not take above the directed dosage, Dr. Cortes declined to refill the prescriptions. During the consultation, Plaintiff was noted as being confrontational. Dr. Cortes wrote in the medical records Plaintiff would only be able to make an appointment within the next 30 days if she was truly in an emergency. On November 13, 2012, Dr. Nevins noted Plaintiff consumed a medication intended to last five to six days, within a two day period. (*Id.* at 462.) Plaintiff had presented at this time to have all of her prescriptions refilled. This proclivity to overdose on her prescribed drugs was noted again on April 3, 2014. During a consultation to review test results, Dr. Nevins noted Plaintiff was "high on lithium." (*Id.* at 586.)

On March 22, 2013, Plaintiff missed an appointment with Dr. Nevins due to severe back pain and "extreme fatigue" due to her menstrual cycle. (*Id.* at 459.) During a consultation on May 15, 2013, Plaintiff noted her lower back was in extreme pain. At the //

---

[3] The records do not note when Plaintiff began taking the plethora of medications she was then currently prescribed.

same consultation, Dr. Nevins noted Plaintiff's obesity as an affliction. (*Id.* at 457.) Additionally, at that time, Dr. Nevins had a thyroid test done on Plaintiff. (*Id.* at 467-70.)

On September 17, 2013, Plaintiff called Dr. Cortes to request a prescription nasal spray. (*Id.* at 498.) Plaintiff also wanted to confirm the "correct medication was refilled." (*Id.*) Dr. Cortes did prescribe Plaintiff Flonase, but did not allow for any refills of the medication. On September 27, 2013, Plaintiff presented to refill her prescriptions for Percocet, Soma, Xanax, and Ambien. (*Id.* at 495.) At that time, Dr. A. Foster noted there were no new symptoms. In a consultation on October 24, 2013, Plaintiff presented in order to refill her Xanax and Percocet prescriptions as well as to treat a yeast infection. (AR at 493.) During this consultation, Plaintiff told Dr. Nevins Plaintiff was having trouble with her fingers losing feeling and turning blue whenever Plaintiff was cold. On November 19, 2013, Plaintiff presented to refill her prescriptions. (*Id.* at 494.) Dr. Nevins refilled them, and noted Plaintiff was complaining of severe pain at the time.

During a consultation on January 3, 2014, Plaintiff reported she was so afflicted with fatigue she could not function. (*Id.* at 583.) Plaintiff described this as having a "light switch go 'off'" which results in Plaintiff not being able to stay awake. On March 7, 2014, Plaintiff presented primarily to have her prescriptions refilled. (*Id.* at 585.) Also during this consultation, Plaintiff complained the previously prescribed Tirosint was not working, and informed the medical assistant Plaintiff had gone back to taking her previous prescription. Plaintiff additionally complained of regular swelling in both her arms and legs. Finally, Plaintiff requested a prescription for birth control to control her irregular menstrual cycle.

Plaintiff's weight has also been a condition Dr. Nevins has addressed. Plaintiff first began denying to have her weight taken and recorded on May 28, 2014. (*Id.* at 588.) During a consultation to allow Dr. Nevins to check Plaintiff's medications, Dr. Nevins discussed Plaintiff's weight gain with Plaintiff. In fact, Dr. Nevins at that time instructed Plaintiff to walk and eat a healthy diet.

//

5

On June 26, 2014, Plaintiff presented to refill her prescriptions for Percocet and Xanax. (*Id.* at 589.) During this consultation, Plaintiff stated she "feels very tired lately." Plaintiff was eating a healthier diet, but was not able to exercise because she was sleeping most of the day. To combat this constant fatigue, Plaintiff requested an increase in the dosage of her hypothyroidism medication.

Plaintiff presented again on July 24, 2014 in order to have her prescriptions refilled, allow Dr. Nevins to follow up on Plaintiff's ongoing medical problems, and to address Plaintiff's new complaints of sciatica pain, severe menstrual cycle pain, extreme fatigue, inability to stay awake, swelling of the hands and feet, fingers turning white in the cold, excessive pain, and a migraine. (*Id.* at 673.) During this consultation, Dr. Nevins also discussed with Plaintiff the possibility of decreasing Plaintiff's pain medications. However, Plaintiff responded that "she would really jump out the window and not be here [if her pain medications were decreased] because the pain is so bad." (*Id.*) Plaintiff stated she would also become "even more depressed and would not want to be on the planet" if she were to cut back on her pain medication. (*Id.*) Upon learning this, Dr. Nevins advised Plaintiff to consult with a pain specialist. Dr. Nevins also ordered an ultrasound of Plaintiff's thyroid. (*Id.*)

During a consultation on August 21, 2014, Plaintiff claimed she had severe pain throughout her entire back. (*Id.* at 677.) Plaintiff rated this pain an eight out of ten on a one to ten scale. At this point, Plaintiff was using a cane to walk. (*Id.* at 679.) One month later, on September 19, 2014, Plaintiff again rated her pain as an eight out of ten, but noted any movement could raise the pain level to ten out of ten. (*Id.* at 685.) During the physical exam conducted on this date, Plaintiff was lethargic and in "moderate stress secondary to pain." (*Id.* at 687.) During the same consultation, Dr. Nevins "stressed the importance of not taking medication when [Plaintiff] is going to be asleep anyway" and the importance of decreasing Plaintiff's intake of pain medication. (*Id.* at 676.)

On September 19, 2014, Dr. Nevins again reminded Plaintiff of the need to decrease Plaintiff's medications. (*Id.* at 685.) On December 12, 2014, Dr. Nevins was

contacted because Plaintiff complained of a yeast infection and wanted a prescription for Tirosint. (*Id.* at 497.) Plaintiff wanted to take four of these pills per day, but was told to take only the directed amount of three per day. (*Id.*)

Plaintiff presented on November 13, 2014, for a routine follow up examination and complained of irregular menstrual cycles. (*Id.* at 699.) Plaintiff stated her menstrual cycles caused hormone fluctuations making Plaintiff "become[] irrational and threaten[] her mother." (*Id.*) Plaintiff's irritability also led to her throwing things, and ultimately leaves her unable to function normally. (*Id.*)

On January 10, 2015, Plaintiff presented to Scripps for an appointment with Dr. Philip Sanderson for a medication check and to have her Percocet prescription refilled. (*Id.* at 702-04.) Dr. Sanderson noted at that time, Plaintiff's diagnoses included chronic pain syndrome, likely caused by fibromyalgia, and anxiety and depression, likely caused by "dealing with these problems for such time." (*Id.* at 702.) The final records from Dr. Nevins, and Scripps in general, are from a visit on October 23, 2015. (*Id.* at 736.) This final visit was unremarkable.

### b. Fallbrook Hospital (Dr. Sasanka)

On April 13, 2013, Plaintiff presented at Fallbrook Hospital complaining of tunnel vision, high heart rate, inability to focus, and difficulty finding words. (AR at 440.) Plaintiff arrived at the hospital by ambulance. (*Id.*) These symptoms came on suddenly and without warning. Plaintiff told Dr. Sasanka Plaintiff's body aches were more severe that day than they had been previously, so Plaintiff had taken more pain medication than usual. While Plaintiff's symptoms had subsided within one hour, Plaintiff complained of feeling dizzy for some time afterward. Notably, at the time Plaintiff was admitted, she stated she had no pain at all. Plaintiff was diagnosed with near syncope and hyperthyroidism. (*Id.* at 441.) Plaintiff was discharged about four hours after being admitted, and was instructed to follow up with her private physician within three days. Additionally, Plaintiff was prescribed Inderal for the fifteen days following her admission.

7

c. North County Health

Plaintiff first presented to Dr. Rami Fodda at North County Health Services on August 29, 2014. (AR at 594.) During this initial consultation, Plaintiff's primary concern was obtaining a referral for a rheumatologist and encrinologist. During this consultation, Plaintiff reported her medical history to include a history of lupus, thyroid nodules, hypothyroidism, memory issues, fibromyalgia, depression and anxiety, "and many others." (*Id.* at 595.) At this point in time, Plaintiff was complaining of pain all over her body and she was using a cane to assist her walking. The records indicate specifically that Plaintiff was suffering from "lower back pain and pain localized to one or more joints." (*Id.*) Dr. Fodda informed Plaintiff he could not refer her to either a rheumatologist or an endocrinologist without reviewing Plaintiff's recent labs and previous medical records. Dr. Fodda noted Plaintiff was "disappointed with this information" and was "concerned" Dr. Fodda would send Plaintiff to have blood tests administered at a different facility than she had been previously using (Scripps). Dr. Fodda discussed the necessity for Plaintiff to maintain a healthy diet, undertake a more active lifestyle, and ensure her medications are taken properly. (*Id.* at 596.)

On October 24, 2014, Plaintiff presented for a follow up to the previous consultation. (*Id.* at 601.) Given Dr. Fodda's reluctance to refer Plaintiff to the requested specialists without having access to recent medical tests, Dr. Fodda ordered such tests and subsequently made the requested referrals.[4] Dr. Fodda referred Plaintiff to an endocrinologist to assess her thyroid nodules; had testing run to assess her depression; referred her to a gynecologist and requested an ultrasound be conducted to assess her menorrhagia and dysmenorrhea; and referred her to a rheumatologist to assess her fibromyalgia and ongoing pain. (*Id.* at 603-04.) Plaintiff was also instructed to exercise

//

[4] Plaintiff had already undergone an ultrasound on her thyroid. (AR at 748.) On October 6, 2014, "multiple small nodules" were found "scattered throughout both thyroid lobes." (*Id.*)

regularly, maintain a healthy diet, and to return to the clinic if any condition worsened or new symptoms presented.

Over three months later, on February 9, 2015, Plaintiff returned to Dr. Fodda to follow up after she had seen the specialists she was referred to. (*Id.* at 611.) Plaintiff informed Dr. Fodda she was seen by an endocrinologist, who recommended Plaintiff end her prescription for lithium. Plaintiff had not yet seen the rheumatologist; but had seen the gynecologist, who recommended Plaintiff have a procedure to alleviate her dysmenorrhea.

Prior to this follow up with Dr. Fodda, on January 12, 2015, Plaintiff presented to another physician with the North County Health Services: Dr. Raheleh Esfandiari. (*Id.* at 637.) Plaintiff was complaining of a prolonged menstrual cycle. Dr. Esfandiari recommended an exam be performed to allow an evaluation of the endometrium, followed by the placement of an intrauterine device (IUD). (*Id.* at 638.) On February 13, 2015, Plaintiff returned to undergo the examination. (*Id.* at 640-42.) Sometime between Plaintiff's pre-operation appointment on April 3, 2015, and her post-operation appointment on May 12, 2015, Plaintiff underwent an operation wherein her uterine endometrium was shaved down. (*Id.* at 643-46.) On July 28, 2015, Plaintiff presented to Dr. Kelly Martinez who placed an IUD. (*Id.* at 650.) At some point thereafter, the IUD became dislodged, causing severe pain and cramping. Dr. Esfandiari recommended removing the IUD and replacing it with a different IUD. This was done on October 12, 2015. (*Id.* at 656-67.) About six weeks later, on November 20, 2015, Plaintiff called complaining of pain caused by the second IUD. (*Id.* at 659.) Plaintiff was advised to follow up with her complaints during her already scheduled appointment the following week; however, if Plaintiff's symptoms were to worsen, to visit the emergency room. (*Id.*) Plaintiff followed up during her subsequent appointment on November 24, 2015 as directed, telling Dr. Esfandiari she could feel the IUD strings expelling. (*Id.* at 660.) Dr. Esfandiari recommended Plaintiff follow up with the pain in two weeks, and if it had not subsided, the IUD should be removed. Plaintiff was also given a prescription for

Percocet. (*Id.* at 661.) On December 2, 2015, Plaintiff reported her pain had "improved greatly." (*Id.* at 663.) Dr. Esfandiari concluded Plaintiff had in fact been passing a urinary stone, which was causing the pain Plaintiff had been complaining of and attributing to her IUD. (*Id.* at 665.) On July 1, 2016, Plaintiff had her second IUD removed and an IUD of a different brand placed. (*Id.* at 802.)

d. San Diego Coastal Endrocrinology Group

Plaintiff was referred to Dr. Georges Argoud for her thyroid nodule and hypothyroidism. On December 30, 2014, Plaintiff first presented to Dr. Argoud. (*Id.* at 627.) During the physical examination, Dr. Argoud noted Plaintiff was obese and had a rash on her hands. A limited thyroid ultrasound was conducted; however, the ultrasound was conducted while Plaintiff was in a chair because she could not transfer herself to the examination table. Plaintiff cited her fibromyalgia as reason for this. (*Id.* at 628.) Dr. Argoud did find nodules on each lobe of Plaintiff's thyroid, measuring 0.5 cm. to 1.5 cm. on her right lobe, and the largest being 1.13 cm. on her left lobe. (*Id.*) During this consultation, Dr. Argoud noted many of the symptoms Plaintiff attributed to a thyroid condition were probably unrelated, and Dr. Argoud informed Plaintiff of the importance of testing to guide the accurate administration of the thyroid hormone. In addressing Plaintiff's other medical conditions, Dr. Argoud strongly recommended Plaintiff consult with a psychiatrist about her current prescription for lithium and whether this was the best course of treatment.

On March 30, 2015, Plaintiff presented a second time to Dr. Argoud. (*Id.* at 630.) At that point, Plaintiff stated she was taking the thyroid hormone on an empty stomach. Plaintiff also reported she felt she was "dying inside from exhaustion" due to having insomnia but also serious fatigue. Dr. Argoud instructed Plaintiff about the correct dosing

//

//

//

//

of the thyroid hormone on an empty stomach,[5] and reminded Plaintiff to not mix the hormone with any supplements. (*Id.* at 631.)

### e. Arthritis Care Specialists

Plaintiff was referred to Dr. Raashad Ansari, who is board certified in rheumatology, for an assessment of her chronic pain and underlying lupus. (*Id.* at 667.) Plaintiff first presented to Dr. Ansari on May 28, 2015. Dr. Ansari noted Plaintiff "is a tragic 43-year-old woman" who complained at the time of "Raynaud's phenomenon, chronic pain syndrome, bipolar disease, dysmenorrhea, hypothyroidism[,] and dermatitis." (*Id.*) During a physical exam, Dr. Ansari noted Plaintiff's goiter was noticeable. (*Id.* at 670.) Dr. Ansari concluded, in reference to Plaintiff's apparent Raynaud's phenomenon, that "there is nothing to suggest an underlying autoimmune disease." (*Id.*) Dr. Ansari also noted Plaintiff had "what appears to be a photosensitivity rash on her sun exposed arms." (*Id.* at 671.) Plaintiff was instructed to return in two months' time in order for Dr. Ansari to evaluate how Plaintiff's conditions progressed in that time; however, on October 12, 2015, Plaintiff did not arrive for her scheduled follow up appointment due to a "last minute medical procedure." (*Id.* at 672.)

### f. QTC Medical Group

After Plaintiff filed her application for SSI on June 11, 2013, the Social Security Administration authorized QTC Medical Group ("QTC") to conduct a complete internal examination of Plaintiff. (*Id.* at 473.) On September 25, 2013, Plaintiff presented for this examination. (*Id.* at 474.) Plaintiff reported her chief complaints: fibromyalgia, lower back pain/spasms, lupus, migraine headaches, tremors, left knee injuries, and an episode of near syncope in April of 2013. (*Id.* at 474-75.) Regarding Plaintiff's back pain, Dr. Kanner noted Plaintiff had no numbness, tingling, or weakness. However, upon further

---

[5] The Court notes that during the initial consultation with Dr. Argoud, Plaintiff was noted as having been instructed to decrease a medication from 75 mg. to 25 mg., but due to severe fatigue, Plaintiff had increased the dosage up to 50 mg. without any direction or approval from any physician. (AR at 627.)

examination, Dr. Kanner found Plaintiff had tenderness in her lumbar spine, but no tenderness in her cervical spine. (*Id.* at 479.) Despite this tenderness, however, Dr. Kanner concluded Plaintiff's back pain was "essentially within normal limits." (*Id.* at 482.) Regarding the lupus, Dr. Kanner noted on the date of examination, Plaintiff presented with redness and tenderness in her arms. (*Id.* at 475.) Plaintiff reported she suffered from migraines which can last for hours or days approximately once or twice a month. Plaintiff also reported she suffered from tremors, which began after she was diagnosed with lupus in 2009. Dr. Kanner noted these tremors in Plaintiff's hands. (*Id.* at 480.) According to Plaintiff, the four knee surgeries she underwent from the time she was 14 to 35 caused bilateral knee problems. (*Id.* at 475.) Generally, Dr. Kanner noted Plaintiff was morbidly obese, but was in no acute distress. (*Id.* at 477.) Additionally, Plaintiff could get in and out of a chair without difficulty. At the time of the examination, Dr. Kanner noted there was no evidence of a mass in Plaintiff's neck. (*Id.* at 478.)

In assessing Plaintiff's functional capacity, Dr. Kanner found Plaintiff's only restrictions were that Plaintiff should not climb ropes, ladders, or scaffolding due to her hand tremors. (*Id.* at 482.) Additionally, Plaintiff's work requiring handling should be less than occasional. Dr. Kanner also concluded Plaintiff "should not work at heights or around dangerous machinery," nor should Plaintiff be exposed to loud noise or sunlight. (*Id.* at 483.)

On April 2, 2014, the Social Security Administration authorized QTC to perform a complete psychiatric examination on Plaintiff. (*Id.* at 530.) For these purposes, Plaintiff presented to Dr. Gregory Nicholson. Plaintiff's primary psychological complaint at that time was her anxiety. (*Id.* at 531.) Plaintiff reported she "suffers from panic attacks whenever she is in public." (*Id.*) Plaintiff also endorsed having a depressed mood, insomnia, fluctuating appetite, decreased energy, trouble concentrating, and decreased interest in normal activity. (*Id.* at 532.) At the time of the examination, Plaintiff was taking Ambien, lithium, and Xanax, which had been prescribed by her physicians, not a psychiatrist.

Plaintiff reported living with her parents due to the pain she suffers from every day; however, Plaintiff also reported being capable of dealing with money and paying bills, and she is able to go out on her own. (*Id.* at 533.) While Plaintiff reported having anxiety and depression, Dr. Nicholson noted these diagnoses were based on history of perceived panic attacks and depressed moods, not an actual medical professional's diagnosis based on objective evidence. (*Id.* at 535.) Contrary to Plaintiff's bleak outlook on her prognosis, Dr. Nicholson opined Plaintiff was "expected to improve in the next twelve months with active treatment." (*Id.*)

Assessing Plaintiff's functional capacity, Dr. Nicholson found only one area which may be affected by Plaintiff's psychological conditions: Plaintiff's ability to relate and interact with coworkers and the public. However, Dr. Nicholson reported this as only "mildly limited." (*Id.*) Dr. Nicholson ultimately found Plaintiff's "ability to maintain regular attendance in the work place and perform work activities on a consistent basis is not limited." (*Id.* at 536.)

### III. ADMINISTRATIVE BACKGROUND

Plaintiff filed her original application for disability benefits on June 11, 2013. (*Id.* at 14.) The claim was denied initially on November 6, 2013, and again upon reconsideration on May 9, 2014. (*Id.*) The Plaintiff appeared at an initial hearing on April 5, 2016, wherein Plaintiff's mother acted as her representative. (*Id.* at 92.) After discussing the medical records already sent to the ALJ and those which were still missing, the ALJ informed Plaintiff of her right to retain an attorney representative. (*Id.* at 118-23.) The ALJ then terminated the hearing in order to allow Plaintiff to retain such representation. (*Id.* at 134.)

Plaintiff appeared at a second hearing on July 25, 2016, with attorney representation. (*Id.* at 34.) At this hearing, Plaintiff testified on her behalf. Additionally Dr. Charles Cooke testified as a medical expert and Erin Welch testified as a vocational expert. Dr. Cooke had examined Plaintiff's medical records and provided an explanation of those records and his opinion regarding their validity. Dr. Cooke noted Plaintiff's

records indicated back pain. (*Id.*) This pain was opined as potentially attributable to Plantiff's obesity. (*Id.* at 44.) Regardless of the cause, due to Plaintiff never undergoing surgery or having an MRI, and the lack of radial spinal stenosis, Dr. Cooke concluded Plaintiff's back pain did not meet the threshold necessary to qualify as a disability. (*Id.* at 41-42.)

Dr. Cooke also discussed Plaintiff's lupus diagnosis. In reviewing this diagnosis, Dr. Cooke noted he "did not see where [Plaintiff] had the Advanced Rheumatology Criteria for the diagnosis of lupus." (*Id.* at 42.) The medical records indicate that Plaintiff did undergo the diagnostic testing for lupus, but none of the tests indicated Plaintiff in fact suffered from lupus. Dr. Cooke cited a quote in the records which stated there was "[n]othing to suggest underlying auto immune disease" to support his skepticism surrounding this diagnosis. (*Id.*) In examining all of this information, Dr. Cooke found Plaintiff's diagnosis of lupus was unsupported, and therefore did not qualify as a disability.

Next, Dr. Cooke discussed Plaintiff's fatigue. Dr. Cooke stated while the fatigue is "mentioned in the record," there are "no great details" given related to this diagnosis. (*Id.*) Based on the lack of details, Dr. Cooke concluded the fatigue "may be de-conditioning" based on Plaintiff's low activity level. Additionally, Plaintiff's use of beta blockers, which can have side effects of fatigue, may be causing or exacerbating the fatigue Plaintiff complains of.

Dr. Cooke then discussed Plaintiff's medical history involving her thyro*Id.* Simply, Dr. Cooke found the diagnoses of Plaintiff's various thyroid issues were unsubstantiated. Plaintiff had been started on thyroid medication for weight gain, which Dr. Cooke characterized as an illegitimate use of thyroid medication. (*Id.* at 43.) Dr. Cooke ultimately concluded Plaintiff "does not appear to have significant debilitating thyroid disease." (*Id.*)

Dr. Cooke discussed Plaintiff's psychiatric medical records. (*Id.* at 44.) The records indicated, in Dr. Cooke's opinion, that a diagnosis of panic disorder was

proposed, as well as bipolar disease being mentioned at one point; however, there is no further information which supports these diagnoses. Plaintiff's ability to interact with others was mildly decreased and was treatable with medication, but such medication was only taken occasionally. These diagnoses were reported to cause a mild depression of concentration, pace, and persistence, but Dr. Cooke found these symptoms were not "terribly severe" and therefore were not disabling.

Plaintiff's "poly substance abuse" was described by Dr. Cooke as "the big problem." (*Id.*) Dr. Cooke found this problematic because Plaintiff was regularly prescribed multiple narcotics to manage her pain. The first point in the record where this is evident is from Plaintiff's emergency room visit on April 13, 2013. At that point, Dr. Cooke noted Plaintiff presented at the emergency room complaining of fibromyalgia and lupus. Plaintiff "wanted Percocet and refused to take antidepressants saying that they made her, quote, 'go psychotic,' unquote." (*Id.* at 44-45.)

Following all of these observations, Dr. Cooke concluded Plaintiff did not meet or equal any condition which would render Plaintiff disabled. (*Id.* at 46.) Dr. Cooke did testify that Plaintiff had functional limitations. These were: deconditioning, restriction to light duty, avoiding hazardous things, and because of Plaintiff's back pain, limited fine manipulation and manual dexterity. (*Id.* at 46-47.)

In addition to Dr. Cooke's testimony, the ALJ also heard from vocational expert Erin Welch. The ALJ gave Welch a hypothetical wherein Plaintiff was limited to light work, but could not climb ladders, ropes, or scaffolds, and must avoid all exposure to hazards such as moving machinery and unprotected heights, and is limited to occasional climbing of stairs or ramps, balancing, stooping, kneeling, crouching, and crawling. (*Id.* at 71.) Welch found that including all of these limitations, and removing any skill required for a specific job, there were still positions Plaintiff could perform. Welch gave the example of a housekeeper at a hotel. (*Id.*) An even more sedentary position could be performed, an example of which was a document preparer. (*Id.* at 71-72.) Welch also opined that, even taking into consideration all of Plaintiff's limitations given in the

hypothetical, Plaintiff would still be able to perform her previous job as a choreographer. (*Id*. at 74.) A position available to Plaintiff involving only light physical would be, according to Welch, an equipment rental clerk or an usher. (*Id*. at 75.) Welch did testify that if Plaintiff would be off task for at least one hour during the day in addition to any regular breaks, no jobs would be available for her to work. (*Id*. at 78.) Additionally, if Plaintiff would need a minimum of two days per month off due to medical reasons, a sustainability issue would arise which would likely preclude Plaintiff from obtaining employment anywhere. (*Id*.)

Following this hearing, on August 17, 2016, the ALJ rendered his decision, which was unfavorable to Plaintiff. The ALJ found Plaintiff was not in fact disabled, but instead was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id*. at 25.) The ALJ made the following additional findings of fact and conclusions of law:

1. The [Plaintiff] has not engaged in substantial gainful activity since June 11, 2013, the application date (20 CFR 416.971 *et seq*).

2. The [Plaintiff] has the following severe impairments: fibromyalgia; obesity; and chronic low back pain (20 CFR 416.920(c)).

3. The [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: never climb ladders, scaffolds, or ropes; must avoid all exposure to hazards such as moving machinery and unprotected heights; and occasionally climb stairs/ramps, balance, stoop, kneel, crouch, and crawl.

5. The [Plaintiff] is unable to perform any past relevant work (20 CFR 416.965).

6. The [Plaintiff] was born on July 27, 1971 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed. (20 CFR 416.963).

7. The [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination

3:17-cv-02141-AJB-PCL

of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is "not disabled," whether or not the [Plaintiff] has transferable job skills (*See* SSR 82-41 and 20 CFR Part 414, Subpart P, Appendix 2).

9.  Considering the [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 CFR 416.969 and 416.969(a)).

10.The [Plaintiff] has not been under a disability as defined in the Social Security Act, since June 11, 2013, the date the application was filed (20 CFR 416.920(g)).

(*Id.* at 16-25.)

Plaintiff appealed the ALJ's decision to the Appeals Council, which denied the appeal. (*Id.* at 5.) In a letter dated August 21, 2017, the Appeals Council found Plaintiff's arguments for reconsideration "do not provide a basis for changing the [ALJ]'s decision." (*Id.*) Following this denial, Plaintiff filed the complaint in the current case. (Doc. 1.) Plaintiff subsequently filed an amended complaint on November 9, 2017. (Doc. 5.) Commissioner answered the amended complaint on February 20, 2018, and lodged the administrative record at the same time. (Docs. 14, 15.)

On March 22, 2018, Plaintiff filed a motion for summary judgment. (Doc. 18.) This motion argues the ALJ failed to provide specific and legitimate reasons to reject the limitations assessed by the treating and examining doctors, and that the ALJ failed to provide clear and convincing reasons to reject the subjective pain and symptoms reported by Plaintiff. (Doc. 18.) On April 25, 2018, Commissioner responded to this motion, and filed her own cross-motion for summary judgment. (Docs. 21, 20.) Commissioner, in this cross motion, argues the ALJ properly evaluated the medical opinion evidence and properly discounted Plaintiff's alleged symptoms. (Doc. 20-1 at 2.)

## IV. STANDARD OF REVIEW

The decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

*Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the ALJ as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160-61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms. *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036).

## IV. DISCUSSION

In her motion, Plaintiff advances two arguments she believes warrant summary judgment in her favor. First, Plaintiff contends the ALJ gave the medical experts inappropriate levels of deference, and failed to provide specific and legitimate reasons for rejecting the limitations assessed by some of the experts. (Doc. 18 at 4.) Second, Plaintiff argues the ALJ did not provide clear and convincing reasons for rejecting Plaintiff's subjective testimony pertaining to her symptoms. (*Id.* at 9.) Commissioner disagrees with these contentions, and instead argues the ALJ was correct in finding some of the experts less credible than others, and finding Plaintiff's subjective testimony to lack credibility. (Doc. 20 at 3, 20.)

a. Expert Testimony

The ALJ considered medical opinions from six medical professionals: Dr. Charles Cooke, Dr. Gregory M. Nicholson, state agency physicians Dr. J. Hartman and Dr. G.

Taylor-Holmes, Dr. Amy L. Kanner, and Dr. Melinda Nevins. (AR at 10-11.) The ALJ is responsible for determining whether a claimant meets the statutory definition of disability and is not bound by a physician's ultimate conclusion that the claimant is "unable to work" or "disabled." 20 C.F.R. §§ 404.1527, 416.927(d)(1). But the Commissioner generally must defer to a physician's medical opinion, such as statements concerning the nature or severity of the claimant's impairments, the claimant's physical or mental limitations, and what the claimant can still do despite the impairments and limitations. 20 C.F.R. §§ 404.1527, 416.927(a)(2).

The regulations make clear that opinions of treating doctors generally should be given more weight than the opinions of other doctors. *Id.*, §§ 404.1527, 416.927(c)(2). "If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). To meet this requirement, the ALJ must provide "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

Dr. Cooke's opinion received "great weight" from the ALJ due to its "consistency with the record as a whole, Dr. Cooke's review of the entire record, and his familiarity with the social security regulations." (AR at 10.) Dr. Nicholson's opinion also received this high level of deference because "Dr. Nicholson personally observed and examined the [Plaintiff] and his opinion is consistent with the objective findings in the medical evidence of record." (*Id.*) Drs. Hartman and Taylor-Holmes' opinions were given "partial weight" because "the assessments' identification of handling/fingering limitations and limitations related to noise are not well supported by the record as a whole, . . . ." (*Id.* at 11.) Dr. Kanner's opinion was given "little weight" because it was "not consistent with the record as a whole," and overall "the opinion[] expressed seemed based in substantial part on the [Plaintiff]'s reported symptoms; there is very little discussion of *specific* clinical signs and laboratory findings." (*Id.* emphasis in original.) Dr. Nevin's opinion

was also given "little weight" for the same reasons Dr. Kanner's opinion was given little weight. (*Id.*)

The ALJ found Dr. Cooke's testimony was reliable and ultimately gave the opinion great deference. (*Id.* at 23.) Plaintiff, however, argues the ALJ erred in affording Dr. Cooke such great deference. Instead, Plaintiff contends that because Dr. Cooke was merely opining based on his review of Plaintiff's medical records, Dr. Cooke's opinion should not have been given more weight than the treating and examining physicians. (Doc. 18 at 5-9.) Plaintiff believes Drs. Nevins and Kanner present more reliable opinions. The ALJ afforded more weight to Dr. Cooke's testimony than that of Dr. Kanner because Dr. Cooke had a more developed medical record to review than Dr. Kanner had when she examined Plaintiff. (AR at 23.) Additionally, the ALJ found Dr. Cooke's testimony more reliable than that of Dr. Nivens, who had been treating Plaintiff for over 20 years because Dr. Nivens' opinions were not, according to the ALJ, supported by "specific clinical signs and laboratory findings." (*Id.* at 24.)

"The weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *Ryan v. Comm'r, Soc. Sec. Admin.*, 528 F.3d 1194, 1201-02 (9th Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(3)). Generally, a non-examining physician's opinion is given less weight than a treating physician's opinion. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). However, an ALJ may rely upon the non-examining physician's opinion to reject that of the treating physician so long as the report "is not contradicted by *all other evidence* in the record." Id. (citing *Magallanes v. Brown*, 881 F.2d 747 at 752 (9th Cir. 1989) (emphasis in original))."Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Ukolov v. Barhart*, 420 F.3d 1002, 1004 (9th Cir. 2005) (quotation marks omitted). Moreover, the ALJ may disregard a treating physician's opinion, regardless of whether or not that opinion is contradicted. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th

Cir. 2004) (affirming ALJ's decision to afford treating physicians' opinions only minimal evidentiary weight where those opinions were in the form of checklists, were not supported by objective medical evidence, were contradicted by other statements and assessments of the claimant's medical condition, and were based on the claimant's subjective descriptions of pain).

However, "[a]n ALJ may reject the uncontradicted medical opinion of a treating physician only for 'clear and convincing' reasons supported by substantial evidence in the record." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (stating the same in its step four analysis). Nevertheless, "[i]f the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference . . . ." *Holohan*, 246 F.3d at 1202 (internal quotation marks and brackets omitted). An ALJ may only reject a contradicted treating physician's opinion by providing "specific and legitimate reasons that are supported by substantial evidence." *Ghanim*, 763 F.3d at 1161.

The Ninth Circuit has held that "a conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim*, 763 F.3d at 1161; *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is . . . inadequately supported by clinical findings."). As Commissioner points out here, the ALJ noted

> the rather severe handling limitations that [Dr. Kanner] opined, as well as the sedentary exertional limitations, are not well supported by objective findings outside of the consultative exam itself, and there is no mention of upper extremity issues in such medical records as Exhibits 18F, 15F, and 12F. There thus lacks evidence sufficient to establish ongoing limitations longitudinally over any 12-month period based on the findings of Dr. Kanner."

//

(AR at 23.) Clearly, in making such a statement, the ALJ concluded there was a conflict between the treatment notes included in Plaintiff's medical records and Dr. Kanner's opinion.

Plaintiff argues the ALJ "isolate[d] the record" in an unreasonable way to support this conclusion. (Doc. 18 at 6.) Plaintiff contends the ALJ omitted Exhibit 16F, which indicates evidence of Plaintiff's tremors. (*Id.*) This record instead presents a comprehensive "review of systems." Therein, a positive result for the neurological symptoms including "burning of extremities, dizziness, headache, loss of balance, memory difficulty, numbness, syncope, [and] tremors" is noted. (AR at 669.) Plaintiff is correct in noting that the ALJ omitted this record from his recitation of those records regarding the tremors.

Furthermore, the ALJ purports to have rejected Dr. Kanner's opinion based on her belief that Plaintiff has "rather severe handling limitations." Dr. Kanner opined that based on the tremors Plaintiff exhibited, Plaintiff should be limited in that she not climb ropes, ladders, or scaffolding. (AR at 482.) Despite the ALJ's claim that he has rejected Dr. Kanner's handling limitations, the ALJ in fact notes in his opinion that while Plaintiff "has the residual functional capacity to perform light work," Plaintiff must "never climb ladders, scaffolds, or ropes." (*Id.* at 18.) In making such a finding, the ALJ must have afforded Dr. Kanner's opinion more than the "little weight" his decision claims. (*Id.* at 23.) Thus, while Plaintiff argues the ALJ erroneously did not defer to Dr. Kanner's opinion, it is clear the ALJ did in fact give deference to the opinion in making his finding that Plaintiff has limitations due to her tremors. Regardless of the ALJ's failure to include Exhibit 16F in his analysis of Plaintiff's tremors, the ALJ did find some limitation based on Dr. Kanner's report, and included such limitations in his decision.

In addition to Dr. Kanner, Plaintiff argues the ALJ did not afford proper deference to Dr. Nevins' opinion. (Doc. 18 at 8-9.) Plaintiff claims the ALJ used boilerplate language in denying Dr. Nevins' opinion, and such language does not comport with the "specific and legitimate" requirement for an ALJ to reject the opinion of a treating

physician. (*Id.*) Commissioner contends Dr. Nevins' treatment records of Plaintiff were rife with "Plaintiff's self-reported symptoms and complaints," showed Dr. Nevins merely "refilled Plaintiff's medications, and recorded [Plaintiff's] vital signs." (Doc. 20-1 at 18.) Other than this general information, "Dr. Nevins' own treatment notes reflected few clinical findings and little objective evidence to support the significant limitations that she endorsed." (*Id.*)

Here, the conflict between treatment notes and opinions of the treating physician provided the ALJ with ample grounds to deny Dr. Nevins' opinion regarding Plaintiff's limitations. *See Ghanim*, 763 F.3d at 1161. While Dr. Nevins' appointments with Plaintiff were consistent and seemed to involve a fairly thorough examination each time, Commissioner is correct in noting the records indicate the bulk of the symptoms were reported by Plaintiff, and generally, Dr. Nevins' simply refilled Plaintiff's prescriptions and prescribed additional medication to alleviate Plaintiff's new, self-reported symptoms. In fact, in the time a different physician met with Plaintiff instead of Dr. Nevins, the alternate physician noted Plaintiff's alleged ailments were not always substantiated. For example, Dr. Cortes noted during one appointment that Plaintiff was abusing her prescriptions, and denied Plaintiff's refill request. (AR at 463.) At another time, Plaintiff presented with "shingles" and Dr. Cortes did not prescribe any medications for this claimed ailment. (*Id.* at 465.) However, at an appointment soon after with Dr. Nevins, Plaintiff again presented with "shingles," and Dr. Nevins prescribed medication to treat the ailment and added shingles to her list of complications Plaintiff suffered from. (*Id.* at 464.)

In assessing Dr. Nevins' opinion, the ALJ found the opinion deserved "little weight . . . because [it is] not consistent with the record as a whole." (*Id.* at 24.) Additionally, the ALJ found "the opinion[] expressed seem[s] based in substantial part on the [Plaintiff]'s reported symptoms; there is very little discussion of *specific* clinical signs and laboratory findings." (*Id.*) In making such a finding, the ALJ paraphrased Dr. Nevins' findings, and cited to the records showing such findings. Plaintiff, however,

claims this recitation and two sentence explanation of the ALJ's denial of Dr. Nevins' opinion is insufficient. (Doc. 18 at 6.) The Court disagrees.

The ALJ discussed Dr. Nevins' opinions in much further depth than Plaintiff has recognized. In fact, in the summary of Plaintiff's medical history and records, the ALJ cited almost exclusively to Dr. Nevins' records when noting Plaintiff's diagnoses. (*Id.* at 6-10.) The ALJ found the Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." (*Id.* at 22.) Additionally, in discounting Dr. Nevins' opinion, the ALJ refers to the physical examinations "as discussed above" in the decision. (*Id.* at 23.) Those physical examinations were the numerous appointments and records derived therefrom with Dr. Nevins, which the ALJ explained in detail in order to show Plaintiff's testimony was also unreliable. Plaintiff had echoed Dr. Nevins' multiple diagnoses of Plaintiff which cause Plaintiff to be disabled. However, in discussing the generally unremarkable examinations done by Dr. Nevins and other physicians, the ALJ rejected these claims. Thus, the reasoning the ALJ presented for rejecting Plaintiff's testimony, discussed *supra*, can also apply to his rejection of Dr. Nevins' testimony, making the two sentences included in the discussion of Dr. Nevins' opinion only a small portion of the actual analysis of Dr. Nevins' opinion and treatment history with Plaintiff.

Because the ALJ reasonably addressed the conflicting opinions of Dr. Cooke, Dr. Kanner, and Dr. Nevins, and provided specific and legitimate reasons for rejecting the opinions of the latter two physicians, the Court must defer to the ALJ's decision. *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999) ("Where evidence may reasonably support more than one interpretation, [the Court] may not substitute [its] judgment for that of the [ALJ].").) The Court therefore finds Plaintiff's first argument regarding the medical experts fails.

b. Plaintiff's Testimony

Plaintiff next argues the ALJ erred in not providing clear and convincing reasons to reject the subjective pain and symptoms, as reported by Plaintiff. Specifically, Plaintiff

argues "the ALJ's subjective pain analysis is almost non-existent." (Doc. 18 at 10.) Plaintiff finds the ALJ's decision to be lacking in specifics, and instead only relying upon boilerplate language. (*Id.*) Furthermore, Plaintiff points to Dr. Nevins' and Dr. Kanner's opinions, which Plaintiff claims support her subjective claims. (*Id.* at 11.) Additionally, Plaintiff argues her "need for powerful narcotic medication, muscle relaxers[,] and tranquilizers" all indicate her claims regarding her pain and other symptoms are val*Id.* (*Id.* at 12.) Commissioner rebuts this argument by pointing out the language in the ALJ's opinion where the ALJ gave specific reasons for discounting Plaintiff's testimony. (Doc. 20-1 at 25-26.) In addressing the two step analysis to determine the credibility of Plaintiff's testimony, the ALJ found,

> After careful consideration of the evidence, the undersigned finds that the [Plaintiff]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff]'s and third party statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> The undersigned finds the claimant's allegations less than fully consistent with the evidence. The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The record reflects significant gaps in the claimant's history of treatment and relatively infrequent trips to the doctor for the allegedly disabling symptoms. Furthermore, the claimant's use of medications does not suggest the presence of impairments which is more limiting than found in this decision.
>
> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(AR at 22-23.)

//

A claimant carries the burden of producing objective medical evidence of his or her impairments and showing that the impairments could reasonably be expected to produce some degree of the alleged symptoms. *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003). But once the claimant meets that burden, medical findings are not required to support the alleged severity of pain. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); *see also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("claimant need not present clinical or diagnostic evidence to support the severity of his pain" (citation omitted)).

Instead, once a claimant has met the burden of producing objective medical evidence, an ALJ can reject the claimant's subjective complaint "only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so." Benton, 331 F.3d at 1040. The ALJ may consider the following factors in weighing the claimant's credibility: (1) his or her reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and his or her conduct; (3) his or her daily activities; (4) his or her work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which she complains. *Thomas*, 278 F.3d at 958-59. Here, the ALJ did not address evidence of malingering. (*See generally* AR at 22.) Thus, in rejecting plaintiff's credibility, the ALJ was required to articulate clear and convincing reasons. See Benton, 331 F.3d at 1040. Having carefully reviewed the record, the Court finds that the ALJ provided sufficient clear and convincing reasons for discounting plaintiff's subjective complaints.

In this case, the ALJ relied not only on the objective medical evidence in finding that Plaintiff's subjective complaints were not fully credible, he also relied on Plaintiff's not receiving the medical treatment one would expect a disabled person to receive, Plaintiff's use, and misuse, of medications, and Plaintiff's reportedly limited daily activities. (AR at 22-23.)

//

The amount of treatment Plaintiff received is a permissible consideration in credibility findings. *See Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment"); *see also Torrence v. Astrue*, 2010 U.S. Dist. LEXIS 128618, at * 28 (E.D. Cal. Nov. 24, 2010) (in determining whether the claimant's testimony regarding her pain was credible, the ALJ considered properly that "the treatment notes 'show only medication management' for Plaintiff's symptoms"). Thus, the ALJ's consideration of Plaintiff receiving less medical care than a person who was truly disabled would receive is a valid consideration in the ALJ's consideration of Plaintiff's credibility.

The ALJ's note of the significant gaps in treatment and "relatively infrequent trips" to see a physician are clear and convincing reasons for the ALJ to find Plaintiff's subjective complaints lack credibility. If Plaintiff was truly suffering to the extent she claimed, according to the ALJ, a more comprehensive and routine set of medical records would have been produced. For example, to manage Plaintiff's pain, it was suggested that Plaintiff see a pain management specialist, although no official referral was ever requested or made. Had Plaintiff been suffering from the severe pain she complained of, it is difficult to rationalize Plaintiff's having never consulted withsuch a specialist. Additionally, almost all of Plaintiff's treating physicians at some point mentioned ending Plaintiff's prescription and consumption of lithium. The recommendations usually suggested consulting with a psychiatrist to determine an alternative medication. Plaintiff never did see a psychiatrist, despite all of these recommendations to do so.

Lastly in addressing Plaintiff's credibility, the ALJ noted Plaintiff's use of medications, and misuse of the same, was a factor in his decision. (AR at 22.)[6]

---

[6] Also regarding the medication use in Plaintiff's case, such misuse of medications is a proper factor in a credibility determination. *See Gray v. Comm'r of the Soc. Sec. Admin.*, 365 Fed. App'x. 60, 63 (9th Cir. 2010) (it was a clear and convincing reason to reject a claim of severe pain when "physicians commented that [the claimant's] claims of pain appeared to be the result of drug-seeking"). Where

Finally, the ALJ addressed Plaintiff's self-reported limited daily activities. Plaintiff testified her daily activities were limited because her pain demands she remain in bed the majority of her days. The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)). Despite this, the ALJ found two reasons Plaintiff's testimony regarding her alleged limited daily activities were not credible: first, there was no way to objectively measure any such limitation, and second, there was no way to conclude the degree of limitation attributable to Plaintiff's medical conditions as opposed to other causes. (AR at 22.) For example, Dr. Cooke suggested Plaintiff's fatigue, which confines Plaintiff to her bed oftentimes, could be caused by decompensation, instead of an underlying condition. The conclusion also was based on "the [Plaintiff]'s reported limited daily activities [being] considered to be outweighed by the other factors discussed in [the] decision." (*Id.* at 23.) The ALJ found this lack of clarifying information, in light of the similar lack of clarifying medical records, created a situation where Plaintiff's testimony regarding her limited daily activities simply could not be relied upon.

Ultimately, the ALJ found Plaintiff's subjective symptoms and complaints could not be relied upon. This was mostly based on the lack of any corroborating medical record supporting the Plaintiff's subjective symptoms. While Plaintiff complained of debilitating pain and other medical conditions, Plaintiff never received more than average

---

substantial evidence supported an ALJ's finding that the claimant engaged in drug-seeking behavior, this finding "further undermines her credibility regarding her symptoms." *Halford v. Astrue*, 2011 U.S. Dist. LEXIS 37241, at * 24 (E.D. Cal. Mar. 29, 2011). Here, the medical records indicate Plaintiff often took more than the prescribed dosage of her medications, and frequently presented to Dr. Nevins to have prescriptions refilled before they were due to refilled. (*See, e.g.*, AR at 462.) This type of misuse and failure to follow instructions regarding Plaintiff's prescribed medications also likely came under scrutiny during the ALJ's assessment of Plaintiff's credibility

medical attention, as Plaintiff was never officially referred to a pain specialist, a physical therapist, or any other type of medical professional who would be able to alleviate her allegedly debilitating pain. At the very least, Plaintiff never had an MRI done to attempt a determination of the cause of the pain. Additionally, Plaintiff seemed to be prescribed medication upon medication to address her various complaints. However, at multiple points, these complaints proved to not actually exist. (*See*, *e.g.*, AR at 670, where after multiple appointments claiming Plaintiff suffers from lupus, a doctor noted there was "nothing to suggest [an] autoimmune disease" existed.) These are all adequately clear and convincing reasons for the ALJ to find Plaintiff's subjective symptoms to be not credible. Thus, the Court finds Plaintiff's second argument must also fail.

## V. CONCLUSION

For the reasons set forth above, the Court recommends **GRANTING** Commissioner's motion for summary judgment and **DENYING** Plaintiff's motion for summary judgment.

This report and recommendation is submitted to the Honorable Anthony J. Battaglia pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **June 22, 2018**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **June 29, 2018**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: June 4, 2018

Hon. Peter C. Lewis
United States Magistrate Judge